[Civil No. 2595. Filed July 28, 1927.]

[258 Pac. 306.]

MRS. OLLIE NETHERTON, Widow of FOREST NETHERTON, Petitioner, v. THE LIGHTNING DELIVERY COMPANY and HOME ACCIDENT INSURANCE COMPANY, Respondents.

Messrs. Cox, Moore & Janson, for Petitioner.

Messrs. Chalmers, Fennemore & Nairn, for Respondents.

LOCKWOOD, J.—Forest Netherton was killed by a stroke of lightning on the 4th of June, 1926, and Ollie Netherton, as his widow, presented a claim to the Industrial Commission for compensation under the statute. After hearing all the evidence offered and considering the matter, the commission on the sixteenth day of September denied any compensation, and Ollie Netherton has brought the award before us on a writ of review.

The situation is such that it is necessary we review the evidence in order to ascertain whether it supports the decision of the commission. The facts are undisputed. From them it appears that deceased at the time of his death was employed by the Lightning Delivery Company as a truck driver, and was en-

gaged in driving one of the company's trucks loaded with cement, brick and lime, from Phoenix to the Arizona Quicksilver mine, some 113 miles north of Phoenix. At a point about nine miles from the mine a light rain began to fall and deceased stopped his truck and commenced to cover the load with a piece of canvas. While so engaged a flash of lightning occurred, which caused his instant death. The only person who saw the accident was D. F. Godfrey, a fellow-servant of the deceased, who was driving a similar truck. His testimony, so far as material, reads as follows:

"He (referring to Netherton) was standing in his truck. He had the big sideboards on and from here up was practically all that I could see (points from the breast up). I was on my truck covering up my cement. . . . It just started to sprinkle, and I seen him fall—came a big clap of thunder and lightning, and I seen him fall, and I ran to him, and he was dead when I got to him. . . . It had not even sprinkled up the road yet.

"Q. When this occurred you were up in the mountains, were you? A. Yes, sir.

"Q. What elevation about? A. About 5,000, I think.

"Q. Were there any trees around that particular place? A. Not where we were.

"Q. . . . Was there anything about the truck, or contents of the truck, or its load that would in any way attract lightning? A. I don't think so.

"Q. You didn't notice anything else that would cause him to fall over at that time, outside the lightning, did you? A. No, sir."

It is admitted that deceased at the time of his death was engaged in the due course of his employment, but it is contended by respondents that the accident did not "arise out of" the employment.

The Arizona Workmen's Compensation Act (Laws 1925, chap. 83), like nearly all others, requires, in order that benefits be paid thereunder, an accident

occur (a) "arising out of" and (b) "in the due course of" the employment. It is not sufficient that one of these elements exist; both must concur. The question then arises in every case whether the facts show this concurrence. The leading case in the United States defining the meaning of these two terms is *In re McNicol et al.*, 215 Mass. 497, L. R. A. 1916A 306, 102 N. E. 697. This case has been cited and approved times without number by the American courts, and we adopt its language in Arizona as giving the best definition and explanation of the two phrases we have been able to discover. The court therein says:

"It is not easy nor necessary to the determination of the case at bar to give a comprehensive definition of these words which shall accurately include all cases embraced within the act and with precision exclude those outside its terms. It is sufficient to say that an injury is received 'in the course of' the employment when it comes while the workman is doing the duty which he is employed to perform. It 'arises out of' the employment, when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. *The causative danger must be peculiar to the work and not common to the neighborhood.* It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but

after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." (Italics ours.)

The standard is plain and easily comprehended, the difficulty being in an application of that standard to the facts of each case. The question of injury by lightning is one which has not been before the courts as often as many other kinds of accident. We are, however, not without precedent to assist us. Counsel for petitioner has cited us to the following cases, in which an award was allowed for death by lightning: *Aetna Life Ins. Co.* v. *Industrial Commission*, 81 Colo. 233, 254 Pac. 995; *De Luca* v. *Board of Park Com.*, 94 Conn. 7, 107 Atl. 611; *State of Minn., etc.*, v. *District Court*, 129 Minn. 502, L. R. A. 1916A 344, 153 N. W. 119; *United States Fid. & Guar. Co.* v. *Rochester* (Tex. Civ. App.), 281 S. W. 306; *Madura* v. *City of N. Y.*, 238 N. Y. 214, 144 N. E. 505; *Emmick* v. *Hanrahan Brick & Ice Co.*, 206 App. Div. 580, 201 N. Y. Supp. 637.

In all of these cases the board or commission passing on the facts allowed compensation for death by lightning, and the award was upheld by the courts. On the other hand, there are many cases where either the commission refused to allow compensation and its action was sustained, or the award when made in favor of the applicant was set aside by the courts. Typical of the class, where the denial of compensation was affirmed, are the following: *Hoenig* v. *Industrial Commission*, 159 Wis. 646, L. R. A. 1916A 339, 150 N. W. 996; *Klawinski* v. *Lake Shore etc. Ry. Co.*, 185 Mich. 643, L. R. A. 1916A 342, 152 N. W. 213; *Kelly* v. *Kerry Co. Council*, 42 I. L. T., 23 B. W. C. C. 194; *Wiggins* v. *Industrial Accident Board*, 54 Mont. 335, Ann. Cas. 1918E 1164, L. R. A. 1918F 932, 170 Pac. 9; *Griffith* v. *Cole*, 183 Iowa 415, L. R. A. 1918F 923, 165 N. W. 577.

Belonging to the second class, where compensation allowed was set aside, are *Thier* v. *Widdifield*, 210 Mich. 355, 178 N. W. 16; *Alzina Con. Co.* v. *Industrial Commission*, 309 Ill. 395, 141 N. E. 191; *Gale* v. *Krug Park Amusement Co.*, 114 Neb. 432, 46 A. L. R. 1213, 208 N. W. 739.

The facts in each of these cases are different and it would be of little value to state them, but running through all of them we find the general principle of law which should apply in substantial agreement. It may be briefly stated thus: When the workman *by reason of his employment,* is more exposed to injury by lightning than are others in the same locality and not so engaged, the injury may be said to arise out of the employment; when, however, it appears that nothing in the nature of the employment has exposed him to any more danger than that shared in common by the general community, the injury does not arise out of the employment and is not compensable. To use an extreme illustration, it is a notorious fact that lightning is more apt to strike a very high structure standing out above its fellows than the surface of the ground. If a workman were engaged in repairing the summit of the Washington Monument or the Eiffel Tower during a thunderstorm, and were injured by lightning while so doing, it would very properly be said that the risk in such employment of injury by lightning was greater than that of the ordinary person in the cities of Washington and Paris. If, on the other hand, the ordinary clerk or messenger going about his master's business on the street were suddenly struck while in the midst of a crowd, it could not be said that his occupation increased his risk of being so struck over that of the ordinary pedestrian. Each case must therefore be considered on its own facts. But the standard for testing those facts is always

the same to wit, *Did the employment increase the danger?*

This general rule is not seriously disputed by petitioner. She contends, however, that deceased's employment did increase the danger in that it required him to go from the altitude of Phoenix, some 1,100 feet, to an altitude of about 5,000 feet, and that the danger from lightning is far greater there than at the lower elevation. We do not think we can assume as a matter of judicial notice that such a difference necessarily increases the risk of being struck by lightning, and there is no other fact testified to or even suggested by the evidence which would indicate that deceased's employment increased his danger. It seems to us the case falls clearly within the old parable of the Scripture, where two women were grinding at the mill, and one was taken and the other left. The Industrial Commission in denying compensation necessarily held deceased's employment did not increase his risk of death by lightning, and, the evidence sustaining such a finding, we are bound thereby. *Fedcral Mut. L. Ins. Co.* v. *Industrial Commission,* 31 Ariz. 224, 252 Pac. 512.

While the Workmen's Compensation Law of Arizona is liberal in the highest degree in protecting those coming within its purview against industrial accidents, it is not intended to provide general insurance against death or injury under all conditions. It may be that eventually it will be considered advisable for the state to insure all of its citizens against death and disability, no matter what the circumstances, but it has not as yet assumed that responsibility, and while the act should be liberally construed so as to grant compensation in every case reasonably within its purpose, we cannot extend it to take the place of a general insurance policy covering death from any cause.

It appearing to us that the Industrial Commission was justified in finding that the accident did not "arise out of" the employment, its award is affirmed.

ROSS, C. J. (Concurring).—Under the facts of this case, I think Mr. Justice LOCKWOOD'S opinion is correct. I concur in what he says and wish to add the following observations:

The cases agree in this: That if an employee is killed by lightning, it will be treated as arising out of his employment if such employment exposed him to the hazard of lightning more than the community in general was exposed to that element. Whether the exposure of the employee is appreciably greater than others is primarily for the determination of the Industrial Commission, whose duty, under the law, it is to take the evidence thereon and to make findings.

"It is the general rule that the circumstances in a particular vocation, in order for an employee to claim the benefits of the Workmen's Compensation Act [Hurd's Rev. St. 1921, c. 48, §§ 126–152i] must be appreciably and substantially beyond the ordinary risk, so that there is extra danger to which employees in ordinary occupations or places of employment are not subject; that the decision of such a question cannot depend upon inference arrived at by conjecture or speculation; that the burden of proof is upon the applicant to show that the position of the injured person was more hazardous than that of others in the same community or that by reason of the employment the risk was greater." *Alzina Const. Co.* v. *Industrial Commission*, 309 Ill. 395, 141 N. E. 191.

If the commission determine that the employee was exposed to lightning more than the normal risk to which all are subject, the courts, with few exceptions, have approved of such finding, and, likewise,

if they find he was not exposed more than the normal, such finding is approved. *State of Minnesota ex rel., etc.*, v. *District Court*, 129 Minn. 502, L. R. A. 1916A 344, and note, 153 N. W. 119.

The finding of the commission here being, in effect, that the employee's employment did not expose him to a greater danger from lightning than if he had not been employed, and the evidence being in entire accord with such finding, we would not be justified in setting the finding aside. There was no evidence that mere altitude would be such exposure, and we cannot, as a matter of law, presume it is. *Wiggins* v. *Industrial Acc. Board*, 54 Mont. 335, Ann. Cas. 1918E 1164, L. R. A. 1918F 932, 170 Pac. 9.

If the court may take judicial notice that one in a high altitude is more apt to be struck by lightning than in a low altitude, the question arises at what altitude will we start, with such presumption. In this case the accident was at approximately 5,000 feet. What would we do if it happened at 4,000, or 3,000, or 2,000 feet? If it be conceded that the employee was engaged to work in and around Phoenix, where the altitude is about 1,100 feet, would we presume if he were struck by lightning there that it was an act of God, but if he left the valley for a higher altitude and was struck that it was not an act of God but a hazard of his employment? And if so, at what point above sea level would we put the presumption in force?

These illustrations are made for the purpose of emphasizing the necessity in all such cases of proof of the fact of extra exposure, and also to stress the obvious fact that judicial presumption cannot take the place of evidence.

The atmosphere possibly is charged with more electricity in a high altitude than in a lower one, but its nature is the same. In one, as much as the other, it is apt to strike the objects closest to its

path, such as trees, tall buildings, etc., but in neither will it ordinarily avoid these and search out objects on the ground, especially where the objects have no attraction for electricity. Relatively, a man in a high altitude is not more exposed than one in a low altitude. It is not known to be a fact that more people proportionately are killed at 5,000 feet altitude than at 1,100 feet. It is said (the New International Encyclopedia, by Dodd, Mead & Company) the greatest mortality from lightning is in the upper Mississippi Valley and the Rocky Mountains—one a low and the other a high altitude.

If compensation is to be allowed on the legal presumption of extra hazard, then every person killed by lightning, earthquakes, cyclones, tornadoes and floods would be entitled to compensation, and it makes no difference that these are things which human vigilance and industry can neither foresee nor prevent. The rule is that the victim in such cases must bear alone such burden, inasmuch as human industry has nothing to do with it, and inasmuch as the employee is no more subject thereto than any other person. Every human being is likely to suffer from events in which he has no share of responsibility. The exception is when the employment is shown to have exposed the employee to risks not common to all.

The mere fact that the employee would not have been injured if he had not been employed at the place where the lightning struck is no argument. In the same sense, the fact that he was born establishes a causative connection. If he had not been born he would not have been struck by lightning, or if the truck he was driving had never been sold to his employer he would not have been struck. If he had been driving a horse and buggy he would not have reached the spot at the moment the lightning

did, or if he had been a Lindbergh he would have long since passed the spot. 28 R. C. L. 806, § 94.

The state has not provided protection against the acts of God, and for the court to give it would be a usurpation of legislative power.

We have been able to find but one court holding that proof of injury or death by lightning was sufficient to bring the case within the compensation act, and the latest expression from that court is an acknowledgment that the rule is wrong and should not have been adopted. *Aetna Life Ins. Co.* v. *Industrial Commission,* 81 Colo. 233, 254 Pac. 995.

McALISTER, J. (Dissenting).—In my opinion the accident which resulted in Netherton's death not only occurred in the course of his employment, but arose out of it as well within the meaning of these words as used in the Workmen's Compensation Act; hence, I am unable to concur in the judgment of my colleagues affirming the order denying compensation.

The general rule, it is true, is that if an employee is struck by lightning his injury or death therefrom is not treated as resulting from an accident arising out of his employment, but to this rule there is this very important exception—that if his employment exposes him to lightning more than if he had not been so employed, or more than the public generally, it will be so regarded—and it seems plain that at the time he was killed Netherton's work as a truck driver did this to such an extent as to bring his death within the exception. It appears from the evidence that he was struck in a mountainous section of the state at an elevation of approximately 5,000 feet while standing in his truck spreading a canvas over his load to protect it from the rain which had just begun to fall. His head, as he stood up on his load to do this, must have been twelve or fifteen feet

above the ground, and the evidence discloses that there were no trees or houses in close proximity, and that it was in the month of June, at 6:30 in the afternoon. Upon these facts, together with the statement of the witness, Godfrey, that he did not think there was anything about the truck or its contents that would in any way attract lightning, the commission made the finding that Netherton's "injury and death was not by accident and in the course of said employment," but was caused by an agency "beyond human control, which neither vigilance nor industry can foresee or prevent."

If, in addition to the foregoing facts, the question of electrical storms in the mountainous regions of Arizona had been gone into before the commission, especially those in eastern Arizona, the record would disclose what every one familiar with this country at all is cognizant of, that thunderstorms occur much oftener there in the summer season than in the lower lands and valleys, and consequently that the danger from lightning there during that time is increased many fold over that in the Salt River or other low valleys. It is doubtful if there is anyone who has lived in the lower altitudes of the state any great length of time who has not frequently heard this or similar remarks: "I like the mountains, but am afraid of the electrical storms up there."

This is so well known that it is unnecessary to support it with authority, yet the works of a number of distinguished scientists recognize and discuss it. In "Why the Weather," by C. E. Brooks, Professor of Meteorology at Harvard University, at page 121, we find the following:

"The mountain thunderstorm is one of the really appalling phenomena of nature, so frequent are the lightning bolts and so continuous the crash and roll of thunder."

In his "Climates of the United States," at page 339, Professor Robert De Courcy Ward, also of Harvard University, says:

"In general, the nearer people are to the seat of activity, the greater is the danger. Therefore the risk of being struck by lightning is greater on mountains, up to a certain height, than in the valleys and on lowlands. The 'lightning zone' on mountains is at about the level of the base of the thunderstorm clouds. Above and below it there is greater safety."

Again at page 352 he says:

"Taking the United States as a whole, the greater number of trees are struck by lightning in a district including a part of the Colorado plateau, western New Mexico, eastern Arizona, and southwestern Utah. Lightning damages, however, are not solely confined to buildings and trees."

In the "Handbook of Meteorology," p. 117, Jacques W. Redway says:

"Practically all the violent thunderstorms of the United States occur in the warm months. By far the greater number occur in June, July, and August."

In his work on Elementary Meteorology, at page 256, Professor William Morris Davis of Harvard University says:

"The ascending valley breezes that run up the slopes of mountains by day frequently become energetic enough in the summer season to form clouds above the mountain summit, and afternoon thunderstorms are often generated in this way. They drift away from the mountain over which their formation began, and the rain that falls from them trails down to the lower ground, but they seldom survive long, unless other conditions favor their growth. Storms of this kind are well known in the Alps and in the mountains of our western territory. It is not uncommon for an observer in the desert plains between the mountain ranges of Arizona to see several active thundershowers over the higher peaks."

This matter was not gone into at the hearing. However, it is possible for it to be considered, inasmuch as it is so well known both to the public at large and to scientists that it could and should have been noticed judicially. A thing of which the court is advised as well without proof as with it is not a mere presumption but a fact, one that speaks for itself, and constitutes a part of the testimony regardless of proof, and should be given the same consideration it would receive if introduced at the trial through the mouths of witnesses. "To take judicial notice and apply it to the decision of a case" said the court in *Chiulla de Luca* v. *Board of Park Commissioners*, 94 Conn. 7, 107 Atl. 611, "is a right which appertains to every court of justice, from the lowest to the highest." And, as remarked by COLERIDGE, J., "judges are not unnecessarily to be ignorant in court of what everybody else and they themselves out of court, are familiar with." *Lumley* v. *Gye*, 21 El. & Bl. 268.

In disposing of a claim for compensation for death caused by a tree being blown down in a storm, the Supreme Court of New Mexico in *Merrill* v. *Penasco Lumber Co.*, 27 N. M. 632, 204 Pac. 72, took judicial notice of a fact very similar to the foregoing; namely, the sudden fierce and violent storms which occur in the mountains of that state. It said:

"It needs no proof to show that the mountain regions of New Mexico are subject to sudden fierce and violent storms."

The Supreme Court of Connecticut in *Chiulla de Luca* v. *Board of Park Commissioners, supra,* upheld the compensation commissioner of that state in taking judicial notice of the fact that "there is a clear preponderance of scientific authority to the effect that there is greater danger under a tree or in the open than when protected in a house."

The New York Court of Appeals in *Madura* v. *City of New York,* 238 N. Y. 214, 144 N. E. 505, upheld the Industrial Board of that state in taking judicial notice of very much the same facts. .It said:

"We think that as the result of judicial knowledge, which may be taken of scientific facts, the Industrial Board was permitted without expert evidence to find as it did by implication and that we are permitted to say that he was. It is a matter of widespread scientific belief and declaration that a wet tree is a ready conductor of a current of electricity and that a person standing under such a tree is exposed to a degree of danger which does not confront one in the open spaces of a highway or field."

The Wisconsin Supreme Court in *Jackson* v. *Wisconsin Telephone Co.,* 88 Wis. 243, 26 L. R. A. 101, 60 N. W. 430, held that the court could take judicial notice of the following:

"Now, there are some facts of common knowledge known to every reasonable person who has passed the age of childhood. Among these facts are that in this latitude there are at certain seasons of the year frequent and violent · thunderstorms; that at such times the clouds are heavily charged with electricity; which constantly finds its way to the earth in what we call strokes of lightning; that these lightning strokes, in the majority of cases, strike prominent objects, such as trees, poles, and high buildings, and follow them to the ground; that fire is frequently the result of such strokes. These facts are well known to all persons, and no proof of them by expert evidence is necessary."

In addition to the increased danger in mountainous regions it is also commonly accepted as true and noticed by scientists that one in the open and raised above the ground is more exposed to lightning than one indoors or on the ground. *Chiulla de Luca* v. *Board of Park Commissioners, supra; Madura* v. *City of New York, supra.* See "Physics of the Air,"

p. 399, by W. J. Humphreys, Professor of Meteorological Physics, United States Weather Bureau; also "Medical Jurisprudence, Forensic Medicine, and Taxicology," p. 208, by Wetthaus and Becker, and "Meteorology," p. 471, by Dr. Willis I. Milham, Professor of Astronomy in Williams College. In speaking of an effort made in 1900 to secure complete statistics as to the loss from lightning that year the last author states that of the number killed and injured, 1686, 534 were in the open, and that this number was greater than those indoors, under trees, or in barns. He says:

"The number killed and injured in the open is rather a remarkable showing. Most of those killed in the open were either raised above their surroundings because they were on horseback or on a load of grain or on a wagon or agricultural implement or they had some metallic tool in their hands."

Professor C. F. Brooks, in "Why the Weather," page 155, states that an automobile is not as safe as some other places in a thunderstorm. He says:

"The Motor in a Thunderstorm. An automobile is not the safest place in which to be during a thunderstorm. The rubber tires, which, in dry weather, very efficiently insulate a car from the ground against an ordinary electrical charge, offer no appreciable protection against the enormous potential and violence of lightning. This is not the real hazard of the automobile, however, in a thunderstorm. The danger comes either *in the open*, or when a car is parked beneath a tall tree or close to a wire fence. The wise thing for the motorist to do in a thunderstorm is to stop, if possible, somewhere below the general level of the ground, away from tall trees or a wire fence. A spot where the road cuts between high banks would be as good as any."

In this connection the fact that one is in close proximity to a metallic substance is a factor to be

considered. At page 208, "Medical Jurisprudence, etc.," *supra*, is this language:

"Persons, therefore, who are in the neighborhood of or in contact with good conductors are in more danger of injury by lightning than when surrounded by or in contact with poor conductors. The proximity or contact of a large metallic object exposed in a thunderstorm is consequently more or less dangerous."

It being true, therefore, that electrical storms are much more frequent in the mountains in the summer than in the valleys—whether the altitude be four, five, six, or some other thousand feet—and consequently that the danger from them there is much greater than in the lowlands, it follows necessarily that an employment which takes one there at that time and requires him to perform its duties in the open exposes him to them in a greater degree than if he had not been compelled to leave his usual place of work in the valley, and that if a stroke of lightning kills him while there pursuing his work his death results from an accident arising out of his employment. When an employee's work takes him to a place where it becomes more dangerous to follow because of the existence there of some condition, whether that condition be the nature of the work itself, or acts of nature over which neither he nor his employer has any control, such, for instance, as heat, cold, ice, snow, storms or lightning, it is difficult to understand how it can be said that an accident due to that condition and resulting in his death does not arise out of his employment or that there is no causal connection between them. As long as it is known that due to a certain cause it is more dangerous to follow it in that locality than it is at the place where its duties are usually performed, it appears to me to be entirely clear that it is wholly immaterial what the cause of the extra hazard is. It

is a special risk that the employment forces him to take, and to say that he, and not the industry, should bear it is not in accord with my idea of the purposes of the Compensation Act.

It was this principle that led the Supreme Court of New Jersey in *Foley* v. *Home Rubber Co.*, 89 N. J. Law 474, 99 Atl. 624, to reverse the order of the trial judge, the finder of the facts, and allow compensation for the death of one Foley, who, having been sent by his employer from New York to London in 1915 through a dangerous section of the sea, the area declared by the German government as the war zone, lost his life when the "Lusitania" was sunk by a German submarine. With his employers' knowledge he secured passage on this ship, and the court held that, under these conditions, his death resulted from an accident which arose out of his employment. It said:

"If the Lusitania had been lost through a collision, fire, or storm at sea, resulting in the death of Foley, it would, under the principle enunciated in all the cases bearing on this subject, be held to have been an accident arising out of his employment. . . .

"The fact that the attack in this instance was not executed in a way that might have been anticipated, but in a manner said to be contrary to the law of nations, may operate to qualify the degree or nature of the danger and risk to such a peril, but does not eliminate the essential factor in the case that the voyage was one pregnant with risk which the employer must have contemplated, as arising out of and in the course of the employment."

The fact that he would have been killed had he been there in some other capacity or that any one of the general public would have suffered a like fate may be true, but this is wholly immaterial in view of the fact that his employment compelled him to be where the stroke occurred, a place of greatly increased danger from lightning, and exposed him to

it. "Where the employment of the injured person requires him to be at the place where his injury is received," said the court in *Re Harraden,* 66 Ind. App. 298, 118 N. E. 142, "and he is in fact at such place in pursuance of the discharge of the duties of his employment, the risk thereby encountered, is held to be incident to such employment, though the injury may have resulted from conditions produced by the weather to which persons generally in that locality were exposed." Harraden was injured by slipping upon an icy street, and the insurance carrier contended that the accident did not arise out of his employment but was due to an act of nature over which the employer had no control and to which all alike were subject. In declining to accept this view, the court said:

"By reason of his employment he was at the place where he was injured. He was where his employment took him and the hazard of the icy street was incidental to such employment. This proposition is not changed by the fact that the public generally in that vicinity was exposed to the hazards of the icy street. The facts show that Harraden's employment exposed him to increased hazards generally among which was the one which caused his injury. The admitted facts compel the inference that the injury of Harraden resulted from conditions produced by the weather, and likewise because he was in the particular locality at the time in question. The latter fact is due to his employment. The facts admit of no other inference but that for his employment he would not have been in that locality at the time of his injury. His employment was therefore a contributing proximate cause of his injury. By reason of it he was exposed to a hazard which in all reasonable probability he would not otherwise have encountered. The work he was employed to do required travel and made him particularly subject to hazards to an extent far greater than like hazards encountered by the general public.

"Such being the case, the facts not only warrant the conclusion that the injury of Harraden was received in the course of his employment, but they likewise compel the inference that his injury arose out of his employment within the spirit, purpose, and meaning of the Workmen's Compensation Act."

It may be that Netherton would not have reached the place at the particular moment the lightning did had he been driving a horse and buggy, or that he would long since have passed it had he been traveling in an aeroplane, but unfortunately for him his duties required him to go in a truck and it took him there at the fatal moment, just as Foley's employment compelled him to go by ship rather than plane to the spot where he and others on the ill-fated "Lusitania" went to a watery grave. However, he would have passed it perhaps, even in the truck, had he not, in the exercise of extra precaution for his employer's business, stopped to protect his load from the rain by spreading a canvas over it and exposed himself to the lightning by remaining in the open standing on the load, his head some ten or fifteen feet above the ground, for he could have gone a number of yards while bringing his truck to a standstill, leaving his seat, getting on top of the load, and making some headway toward spreading the canvas, far enough in all probability to have meant the difference between life and the loss of it.

If his death under these circumstances had occurred in the valley, the facts would have justified a finding that his employment exposed him to a special hazard from lightning, and consequently that he was killed through an accident arising out of his employment. And when you consider in connection with them the indisputable fact that his employment took him to a place of greater danger from this hazard than if he had not been so employed, or, to use the language of the Minnesota court "necessarily

accentuated the natural hazard from lightning" (*State ex rel. People's Coal & Ice Co.* v. *District Court,* 129 Minn. 502, L. R. A. 1916A 344, 153 N. W. 119), it is my view that no other finding could have been made.

That Netherton's death was due to an accident arising out of his employment is to my mind established by the record, and the finding that it was not is contrary to the facts when fully considered and liberally construed. Hence the award should be set aside.